IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

JOHNNIE RAPER                                                                                          PLAINTIFF

V.                                            NO.  4:08cv00650 JWC

MICHAEL J. ASTRUE,
Commissioner, Social
Security Administration                                                                          DEFENDANT

MEMORANDUM OPINION AND ORDER

Plaintiff, Johnnie Raper, seeks judicial review of the denial of her claim for a period of disability and disability insurance benefits and supplemental security income (SSI) benefits.  Both parties have submitted briefs (doc. 9, 10).  For the reasons that follow, the Court[1] **affirms** the Commissioner's decision that Plaintiff is not disabled within the meaning of the Social Security Act and regulations and, therefore, is not entitled to disability insurance benefits or SSI benefits.

I.

The Commissioner's denial of benefits must be upheld upon judicial review if the decision is supported by substantial evidence in the record as a whole.  *Wiese v. Astrue*, 552 F.3d 728, 730 (8th Cir. 2009); *see* 42 U.S.C. §§ 405(g), 1383(c)(3).  Substantial evidence is "less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion."  *Wiese*, 552 F.3d at 730.  In its review, the Court should consider evidence supporting the Commissioner's decision as well as evidence

---

[1]The parties have consented to the jurisdiction of the United States Magistrate Judge (doc. 11).

detracting from it.  *Id.*  That the Court would have reached a different conclusion is not a sufficient basis for reversal; rather, if it is possible to draw two inconsistent conclusions from the evidence and one of these conclusions represents the Commissioner's findings, the denial of benefits must be affirmed.  *Id.*

## II.

In her application documents and at the hearing before the ALJ, Plaintiff alleged inability to work since March 1, 2000 (Tr. 48, 53, 564), due to fibromyalgia, bulging discs and back pain, bipolar disorder, post-traumatic stress disorder, depression, fatigue, neck and shoulder pain, trichotillomania,[2] headaches, arm pain, anxiety, panic attacks, and a history of substance abuse.  (Tr. 69, 78, 100-01, 107, 114, 125, 137, 574-85.)  Plaintiff was forty years old at the time of the hearing and has a ninth-grade education.  (Tr. 572.)  She has past work as a machine operator and kitchen worker.  (Tr. 128-35, 572-73.)

Under the applicable law, a claimant is disabled if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  The regulations provide a five-step sequential process to determine whether a claimant is disabled.  *See* 20 C.F.R. §§ 404.1520, 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  Basically, those procedures require the ALJ to take into account whether a claimant is working, whether the claimant's physical or

---

[2]The recurrent pulling out of one's own hair.  American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 674 (4th ed., Text. Rev. 2000) (*DSM-IV-TR*).

mental impairments are severe, whether the impairments meet or equal an impairment listed in the regulations, whether the impairments prevent a resumption of work done in the past, and whether they preclude any other type of work. *Id.* Even if found to be disabled under this five-step analysis, a claimant is not eligible for benefits if alcoholism or drug addiction comprises a contributing factor material to the determination of disability. 42 U.S.C. § 423(d)(2)(C). In making this determination, the ALJ must consider which limitations would remain when the effects of the substance use disorders are absent and then decide whether those remaining limitations would be disabling. 20 C.F.R. §§ 404.1535(b), 416.935(b).

Here, the ALJ found at step one that Plaintiff had not engaged in substantial gainful activity since her alleged onset date. The ALJ next determined, at step two, that Plaintiff suffered from severe impairments related to a history of substance abuse, bipolar disorder, back and neck disorder, and fibromyalgia, but that none of her impairments, individually or in combination, equaled a step-three listed impairment as contained in the regulations. At step four, the ALJ found that, due to her substance abuse, Plaintiff had significant limitations in her mental capabilities, which rendered her disabled. (Tr. 11-15, 19.)

Next, taking note of the regulations regarding substance use disorders, the ALJ found that, if Plaintiff were to stop using drugs and alcohol, she would have the residual functional capacity (RFC) to perform light work with certain restrictions due to mental impairments. In evaluating her mental impairments absent substance abuse, he found that she had mild functional limitations in her activities of daily living; moderate limitations in social functioning and maintaining concentration, persistence and pace; and no episodes of deterioration or decompensation in work or work-like settings. *See* 20 C.F.R. §§

404.1520a, 416.920a. He further found at step four that the combination of her physical and mental impairments precluded a return to her past work. At step five, after taking testimony from a vocational expert and considering Plaintiff's age (younger individual), education, work experience and RFC, the ALJ found that there were a significant number of jobs in the national economy which Plaintiff could perform, if she stopped her substance use. The ALJ thus found that her substance use was a contributing factor material to her disability, making her ineligible for disability or SSI benefits at any time through the date of his decision. (Tr. 15-21.) Plaintiff pursued administrative review with no success, making the ALJ's decision the final decision of the Commissioner. (Tr. 3-5.)

Plaintiff argues: (1) the Commissioner's decision regarding her mental impairments was not supported by substantial evidence and the case warrants remand for further mental evaluation and development of the record; and (2) the ALJ failed to properly evaluate the severity of Plaintiff's fibromyalgia and chronic pain.

III.

Plaintiff alleges that she "has been drug free according to the record since October 2006 and has not improved" and thus has been "clearly totally disabled" since that time. She says she has been treated most of her life for severe depression, anxiety attacks, panic attacks, and bipolar disorder, and must receive treatment and medication management. She also states that the ALJ had a duty "to recontact her psychiatrist to determine if [she] is able to function in a work place given her detox and new medications." (*See* doc. 9, at 3-8.)

As recited by the ALJ (Tr. 12, 14) and documented by the record, Plaintiff has a long history of drug and alcohol dependency, which she does not dispute. She reported alcohol use beginning at age 18, usually drinking a twelve-pack a day on weekends and thought she drank two thirty-packs a day after her father died. In October 2006, she said alcohol was "probably her biggest problem," but that she had been sober one month. (Tr. 152, 389-90, 393, 582.) She reported misuse of prescription drugs for several years, including Xanax, Hydrocodone and Soma, with her last use of Xanax in September 2006. (Tr. 389-90, 393.) She reported use of marijuana beginning at age 24, smoking "a joint or two" a day, through June 2006. (Tr. 152, 390, 393.) She reported that she used methamphetamine for several years, reporting in October 2003 that she had used it a month earlier. (Tr. 152, 204, 389-90, 393.) She said she used crack cocaine for a couple of months in 2005. (Tr. 389-90, 393.) The record indicates that she participated in substance-abuse treatment, detox or rehab programs in 1998, 2001, 2002, 2003, 2004, and 2006, but had a history of failing to follow through with appointments. (*E.g.*, Tr. 150-54, 158, 204, 283, 392-93.)

Here, Plaintiff's arguments hinge on two propositions: (1) that she has been drug and alcohol free since October 2006, and (2) that her mental condition has not improved since that time despite being substance-free, thus demonstrating that she suffers from disabling mental impairments outside of her drug and alcohol abuse. As detailed below and in the ALJ's decision, the record refutes her arguments, showing that, although she appeared to be tapering off her consumption of drugs and alcohol, she had occasional relapses through the end of 2006, with no evidence beyond her hearing testimony on April 18, 2007, showing, at the most, four months of sobriety. The evidence also shows that,

as she began decreasing or discontinuing her substance abuse, her psychiatric symptoms began to subside.

On September 18, 2006, Plaintiff was admitted to Living Hope Institute with complaints of increased depression, and thoughts of overdosing or cutting her wrists. She said she last drank alcohol the day before. (Tr. 416, 439-44.) She was placed on alcohol detox protocol, which she tolerated without difficulty. She was started on various medications, her condition improved, and she was discharged on September 24. (Tr. 416-18.) Dr. Richard Flanigin reported that her prognosis was good "if she remains compliant with treatment." (Tr. 418.)

She was referred to Counseling Clinic, Inc. for continuing outpatient treatment. (Tr. 366.) On October 2, 2006, she was evaluated for the outpatient drug and education program (Tr. 365, 392-93) and, on October 16, for psychotherapy and medication management (Tr. 389-91). She was advised that she could not receive any treatment from the clinic for her depression, anxiety and mood symptoms until she was "actively working" the substance abuse treatment program. (Tr. 390.)

Between October 16 and November 6, Plaintiff was a no-show for two treatment appointments, cancelled one appointment, and rescheduled another. (Tr. 361-64.) On October 23, 2006, she went to see her primary care physician, Dr. James Cooper, who reported that she was "doing incredibly better" from when he had seen her in mid-September. She told Dr. Cooper that, after taking the prescribed medications for anxiety and neck pain, "she is doing better than she has done in years." Dr. Cooper noted that her depression was "much better." (Tr. 402.)

On November 17, 2006, Plaintiff attended her first treatment session at the Counseling Clinic, with the goal of completing ten sessions of substance abuse treatment. A urine drug screen that day was positive for Adderall and benzodiazepine. (Tr. 360.) At her next session five days later, on November 22, 2006, she appeared confused and unable to relate to information being presented. She submitted to a drug screen and tested positive for cocaine and benzodiazepine. (Tr. 378.) As a result, four additional sessions were added to her treatment plan. (Tr. 375.) On November 30, she underwent a psychiatric evaluation at the clinic by Constance J. Crisp, M.D., who diagnosed bipolar disorder, alcohol dependence in early remission, benzodiazepine dependence in early remission, and cannabis dependence in early remission. (Tr. 386-88.) Dr. Crisp prescribed Lexapro, Depakote and Lorazepam.

In December, Plaintiff attended five individual or group sessions for the treatment program (Tr. 358, 374-77), was a no-show for one session (Tr. 356), and had a follow-up appointment with Dr. Crisp (Tr. 346-47). On December 1, she reported to a social worker that she was "doing very well," was no longer feeling as depressed, and felt that her bipolar disorder symptoms were "under control." (Tr. 358.) On December 20, she received a drug screen that was positive for benzodiazepine, but it was noted that she was prescribed Adavan (Ativan). (Tr. 376.) She reported to Dr. Crisp at her December 28 appointment that she was "doing better," her racing thoughts were "getting better," and she was "feeling more level in general." Plaintiff reported that she had lost some weight by exercising and watching what she ate, and was "feeling good about herself." Dr. Crisp noted that Plaintiff had normal speech, euthymic mood, full affect, goal-directed thought processes, and fair

judgment and insight. Dr. Crisp continued the same medications, which appeared to be beginning to "help stabilize [Plaintiff's] mood." (Tr. 346-47.)

In January 2007, Plaintiff attended treatment sessions on January 2, 4, 10 and 29, and was a no-show or rescheduled on January 8 and 26. (Tr. 351-54, 372-73.) A drug screen on January 4 was negative. (Tr. 372.) During her January 10 session, she reported that she had relapsed and drank two beers about a month earlier, but that she was now being compliant with her treatment and felt like she had "learn[ed] a lot from the program." She said she was going to get her GED so she could get a job and support herself, which was "a big goal." The therapist noted that Plaintiff was showing evidence of "improved judgment." (Tr. 353.) About the same time, she returned to her primary care physician, Dr. Cooper, telling him she was involved in a government program where they were training her, she was going to school to get her GED, and she needed a form filled out so she could work 15-20 hours a week. (Tr. 405.) Dr. Cooper said he filled out the form and "was happy to do so." (Tr. 405.)

She was a no-show for her Counseling Clinic sessions on February 13 and March 1, and cancelled an appointment on February 15. (Tr. 342, 345, 349.) On February 26, she met with Dr. Crisp, who observed that she was "fairly stable" with Depakote and her sleep troubles seemed to be hormonally related. Plaintiff reported that she was still walking for exercise and was continuing to lose weight. She had normal speech, euthymic mood, full affect, goal-directed thought processes, and "fine" judgment and insight. She was to follow up in three months, or sooner if she had problems. (Tr. 343-44.)

On March 2, 2007, Plaintiff completed her substance treatment program and was discharged. Continued sobriety was encouraged, and she was to report for monthly drug

screens. She said she felt "her life [was] going towards a positive direction." (Tr. 348.) She was a no-show for her April 2 appointment. (Tr. 341.) No further records were submitted.

At the administrative hearing before the ALJ on April 18, 2007, Plaintiff first testified that she had quit drinking in July/August of 2006, and then acknowledged that she was drinking through October 2006. (Tr. 599, 602.) She said she no longer drank or used drugs. (Tr. 581.) She testified that the treatment program had helped her and that, since she was taking her prescribed medications, she was "sleeping pretty good" and the medication was helping her racing thoughts and anxiety. (Tr. 575, 579, 583.) When asked how she handled her stress, she said by "taking [her] meds." (Tr. 583.) She said she had no side effects from her medications. (Tr. 587.) She stated that, when she sought treatment in October 2006, she was not taking any psychiatric medications and had not taken any in "quite a while." (Tr. 599.)

This medical evidence supports the ALJ's conclusion that, when Plaintiff is not abusing drugs or alcohol and complies with her medications, "her bipolar disorder and depression are well controlled." (Tr. 16.)

As noted by the ALJ (Tr. 16), this conclusion is further supported by the extent of Plaintiff's daily activities, which include all manner of household chores, caring for her daughter, preparing up to three meals daily, shopping for groceries and household items, attending church, and visiting friends and relatives. (Tr. 73-75, 123-24.) She reported that, on an average day, she gets up and gets her daughter ready for school, takes her to the bus stop, lies down for a while, then gets up and cleans the house, picks up her daughter, fixes supper, bathes her, helps her with homework, then goes to bed. She said, on some

days, she also goes to doctor appointments or grocery shopping, or pays bills. (Tr. 71, 126.) She said she is able to drive a car, but her license had been revoked and she was taking the necessary steps to get it reinstated. (Tr. 74, 594.) At the time of the hearing, she was living with her boyfriend and her daughter, who was then nine years old. (Tr. 592.) She worked at a nursing home for about six months in 2004 and quit because it was hurting her arm, not because of any mental limitations. (Tr. 573-74, 589.) In January 2007, she was taking steps to obtain her GED and pursue at least part-time work. (Tr. 353, 405.) It is significant that Plaintiff made many of these reports during periods that she was admittedly using drugs and alcohol and not taking psychiatric medication.

Reviewing Plaintiff's allegations and the medical records from 1998 through 2005, the state agency medical and psychological consultants found that she had only mild to moderate restrictions in her activities of daily living, in social functioning, and in maintaining concentration, persistence or pace. (Tr. 294-309, 310-30.)

"Determining whether a claimant would still be disabled if he or she stopped drinking is, of course, simpler if the claimant actually has stopped." *Pettit v. Apfel*, 218 F.3d 901, 903 (8th Cir. 2000). If an ALJ is presented with evidence that a claimant has demonstrated the ability to function during periods of sobriety, he can properly and reasonably conclude that the claimant is able to work when she is not abusing drugs or alcohol. *Vester v. Barnhart*, 416 F.3d 886, 891 (8th Cir. 2005). Here, Plaintiff achieved some degree of sobriety from October 2006 to April 2007 and the recited evidence clearly shows significant improvement in her mental and emotional condition during that time.

Based on the record, the ALJ reasonably found that Plaintiff did have some limitations in mental functioning but that, when she was not using drugs or alcohol and was

compliant with her medications, her symptoms were well controlled and she experienced only mild restrictions in her daily activities, moderate restrictions in her ability to function socially, and moderate limitations in maintaining concentration and carrying out detailed instructions. (Tr. 16.) *See Brace v. Astrue*, No. 08-3023, 2009 WL 2615475, *3-*4 (8th Cir. Aug. 27, 2009) (bipolar disorder not disabling where controlled or controllable by medication and lapses in mental condition were mainly due to noncompliance with prescribed treatment); *Goff v. Barnhart*, 421 F.3d 785, 793-94 (8th Cir. 2005) (ALJ properly found claimant's depression to be not as limiting as alleged where she was stable on medication and experienced only moderate symptoms and moderate difficulties in social, occupational or school functioning); *Vester*, 416 F.3d at 890-91 (ALJ's conclusion that alcoholism was material factor contributing to claimant's disability was supported by evidence of improved mental condition during brief periods of sobriety and physician's opinion that claimant was a severe alcoholic and her mental illnesses might improve with more time sober and mood-stabilizing medication).

Plaintiff points to Dr. Crisp's comment, on November 30, 2006, that "it does seem fairly clear that [Plaintiff] has experienced manic and depressive symptoms outside of substance abuse." (Tr. 387.) The fact that Plaintiff may have experienced such symptoms, and that she requires ongoing medication and treatment to keep the symptoms under control, does not mean she is disabled. Dr. Crisp's treatment notes for the months following that comment, set forth above, make it clear that Plaintiff's symptoms improved dramatically as she discontinued her substance abuse and regularly took her medications. Furthermore, the ALJ adequately accounted for some mental limitations in formulating his RFC assessment, finding that, notwithstanding her substance abuse, she would have:

**good** ability to understand, remember and carry out simple job instructions; **fair** ability to follow work rules, relate to co-workers, deal with the public, use judgment, interact with supervisors, deal with stresses, function independently, maintain attention/concentration, maintain personal appearance, behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability; **poor** ability to understand, remember and carry out detailed but not complex job instructions; and **no** ability to understand, remember and carry out complex job instructions.   (Tr. 19-20.)

Plaintiff also relies on references in the record to GAF (Global Assessment of Functioning) scores of 18 and 40.  (Tr.  417.)  While GAF scores are "certainly pieces of the hypothetical puzzle" in assessing a claimant's functioning, *Wilson v. Astrue*, 493 F.3d 965, 968 (8th Cir. 2007), they are not dispositive in social security cases.  *See* Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50746, 50764-65 (Aug. 21, 2000) (GAF scores are not directly correlative to social security severity assessments).  A GAF score reflects a clinician's assessment of an individual's overall level of functioning only at the time of the evaluation, and is intended for use in planning treatment and measuring its impact. *See DSM-IV-TR* at 32-33.   The referenced scores were assessed in September 2006, when Plaintiff was hospitalized for increased depression and suicidal thoughts.  She was not on any psychiatric medications at the time of admission. (Tr. 416.)   When she was discharged on September 24, her physician said her prognosis was "good" if she was compliant with treatment.  (Tr. 418.)  Eight days later, on October 2, her GAF was assessed as 55 (Tr. 394), and after completing five months of substance abuse treatment, mental health therapy and medication on March 2, 2007, the assessment was again 55 (Tr. 348), indicating "moderate" symptoms or difficulties in

functioning.  *See DSM-IV-TR* at 34; *Goff*, 421 F.3d at 793 (GAF between 51-60 contradicted assertion of severe mental impairment).  This is consistent with the ALJ's conclusions about Plaintiff's level of functioning.

Finally, the ALJ was not required to recontact Plaintiff's treating psychiatrist.  The regulations explain that contacting a treating physician is necessary only if the doctor's records are "inadequate for us to determine whether [the claimant] is disabled," such as when the medical report contains a conflict or ambiguity that must be resolved, does not contain all the necessary information, or does not appear to based on medically acceptable clinical or diagnostic techniques.  20 C.F.R. §§ 404.1512(e), 416.912(e).  Here, Plaintiff's last psychiatric evaluation was on February 26, 2007, where, as noted, Dr. Crisp found that she was "fairly stable" and advised her to follow up in three months, or sooner if she had any problems.  Nothing suggests that Dr. Crisp's records were inadequate, unclear, incomplete, or based on unacceptable clinical techniques.  Her records, in combination with the rest of the record, provided an ample basis upon which the ALJ could make an informed determination of the merits of Plaintiff's disability claim during the relevant time period.

Substantial evidence supports the ALJ's determination that, if Plaintiff were not using drugs and alcohol, she would not be disabled due to mental impairments at any time relevant to his decision, including the period after October 2006.

IV.

Plaintiff's next argument is that the ALJ failed to properly evaluate the severity of her fibromyalgia and chronic pain. Specifically, she contends that the ALJ erred in assessing the credibility of her subjective allegations and in formulating her physical RFC. (*See* doc. 9, at 8-12.)

RFC is defined as "the most [the claimant] can still do" in a work setting "on a regular and continuing basis" despite his or her physical and mental limitations. 20 C.F.R. §§ 404.1545(a)(1), (b) & (c), 416.945(a)(1), (b) & (c). The ALJ bears the final responsibility for assessing a claimant's RFC at step four of the sequential evaluation, based on all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations. *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007); 20 C.F.R. §§ 404.1527(e)(2), 404.1545(a)(3), 416.927(e)(2), 416.945(a)(3). Nevertheless, the burden of establishing the RFC rests on the claimant, not the Commissioner. *Eichelberger v. Barnhart*, 390 F.3d 584, 591-92 (8th Cir. 2004).

Here, the ALJ determined that Plaintiff had the physical RFC for light work, *i.e.*: lift/carry up to twenty pounds occasionally; stand/walk no more than six hours (up to two hours without interruption); sit no more than six hours (up to two hours without interruption); occasionally balance, climb, stoop, crouch, kneel or crawl; and push/pull twenty pounds. (Tr. 19-20.) *See* 20 C.F.R. §§ 404.1567(b), 416.967(b).

Plaintiff alleges that the record does not contain "any objective medical evidence or opinion by any treating or examining physician with regard to Plaintiff's RFC" (doc. 9, at 9). The regulations make it clear that the "lack of a medical source statement will not make [a] report incomplete." 20 C.F.R. §§ 404.1513(b)(6), 416.913(b)(6). Furthermore, as stated,

it is burden of the claimant, not the Commissioner, to prove the extent of his functional capabilities. *Casey v. Astrue*, 503 F.3d 687, 697 (8th Cir. 2007). The claimant's failure to provide medical evidence in this regard will not be held against the ALJ where, as here, there is medical evidence supporting his decision. *Steed v. Astrue*, 524 F.3d 872, 876 (8th Cir. 2008). The medical evidence in the record simply does not support physical limitations to the extent alleged by Plaintiff.

The ALJ noted that Plaintiff had been diagnosed with and treated for fibromyalgia, chronic cephalalgia (neck pain), chronic back pain, shoulder pain, and other complaints of muscle pain since at least 2002. (Tr. 11, 12, 14, 17, 19.) He noted that an arthritis panel in 2002 was normal with a "normal sed rate." (Tr. 12, 246.) He stated that an April 2002 MRI scan of Plaintiff's cervical spine showed "very mild" central posterior disc protrusion at C4-C5 vertebral level and "mild" cervical spondylosis, and that a lumbar MRI was unremarkable. (Tr. 12, 17, 175, 222.) He noted that Plaintiff was referred to a specialist regarding her back pain, but it was determined that this was not "a surgical problem." (Tr. 12, 223, 410.) He noted that she was considering epidural steroid injections in October 2003 but wanted a second opinion before committing. (Tr. 12, 17, 223.) The ALJ referred to a January 2004 examination that revealed normal straight leg raising and deep tendon reflexes. (Tr. 12, 219.) He noted that, in January 2005, Plaintiff complained of left shoulder pain, but her treating physician observed no swelling and a bone scan was normal. (Tr. 12, 213.) Also noted was Plaintiff's June 2005 report to a psychiatrist, Dr. Mary Bonner, that she had received no treatment for her arm and back pain and Dr. Bonner's observation of no physical problems or limitations. (Tr. 13, 282, 287.)

The ALJ stated that Plaintiff obtained narcotic medications for her complaints of pain "but it appears she was just abusing prescription drugs" and had "refused epidural steroid injections." (Tr. 14.) He also stated that her physicians had "limited her access to pain medication due to past abuse." (Tr. 17.) The record supports this, showing that, although she continued to complain of chronic pain and body aches, nothing indicates that she ever decided to proceed with steroid injections after considering them in October 2003 and, instead, continued to request refills of her prescriptions for pain medication. (*E.g.*, Tr. 217, 219-20.) On several occasions, she requested specific medications, which the physicians at times declined to prescribe. (*E.g.*, Tr. 211, 213, 216, 217, 408, 412.) The ALJ noted that, in January 2005, her physician said she had gone through 480 hydrocodone in two and one-half months, which the doctor confirmed with the pharmacy. (Tr. 12, 213.) The ALJ further noted that she reported during a therapy session in October 2006 that she was getting prescriptions from two different physicians and "got caught." (Tr. 14, 393.) As recently as January and February 2007, her primary care physician expressed concern at the number of Vicodin and Lorcet that she was taking to control her alleged neck, back and arm pain. (Tr. 408, 410, 412.) He mentioned the possibility of injections or physical therapy and arranged an appointment with a specialist for February 22, 2007. (Tr. 410.) Plaintiff missed that appointment (Tr. 412), and nothing indicates that she pursued further evaluation or treatment.

The ALJ also stated that he had considered the opinions of the state agency medical consultants, who reviewed Plaintiff's medical records through October 2003 and found her physical capabilities to be compatible with the exertional requirements of medium

work.[3]  (Tr. 19, 330-39.)  In light of the additional medical evidence in the record, the ALJ assessed greater restrictions than those found by the medical consultants, limiting her to light work as stated.  (Tr. 19.)

Plaintiff points to the statement of Ralph Izard, Jr., M.D., who performed a general physical examination on October 29, 2003.  Dr. Izard stated that Plaintiff "would have severe limitations with her abilities to function in a work situation because of her depression and fibromyalgia."  (Tr. 202.)  Although the ALJ stated that he had considered the "medical exhibits" and "the entire record" (Tr. 11, 19), he did not specifically refer to Dr. Izard's report in his decision.  However, an ALJ is "not required to discuss every piece of evidence submitted," and his failure to cite particular findings from a medical opinion does not mean they were not considered.  *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998).  In any event, the ALJ did not err in discounting Dr. Izard's statement.  He examined Plaintiff only one time, and his statement about "severe limitations" due to fibromyalgia is inconsistent with his objective findings that Plaintiff's neck was normal; she had full range of motion in her cervical and lumbar spine and all extremities (shoulders, elbows, wrists, hands, hips, knees, ankles); she had normal straight-leg raising, limb function, reflexes and gait; and she had no joint or sensory abnormalities, or muscle weakness or atrophy.  (Tr. 198-200.)  It is the ALJ's responsibility to weigh the relevant medical opinions and resolve any conflicts, and he is entitled to discount the opinion, in whole or in part, of a one-time examining physician, particularly where it is inconsistent with the physician's other findings and observations.  *See Tindell v. Barnhart*, 444 F.3d 1002, 1004-06 (8th Cir. 2006);

---

[3]Medium work involves lifting up to fifty pounds at a time with frequent lifting or carrying of up to twenty-five pounds.  20 C.F.R. §§ 404.1567(c), 416.967(c).

*Vandenboom v. Barnhart*, 421 F.3d 745, 749-50 (8th Cir. 2005); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (factors to evaluate in determining weight given to medical opinions, including "frequency of examination" and "consistency").

Moreover, the ALJ properly evaluated the credibility of Plaintiff's subjective complaints regarding the extent of her pain and physical limitations. A claimant's subjective complaints may be discounted if they are inconsistent with the evidence as a whole. *Casey*, 503 F.3d at 695. The ALJ is in the best position to gauge credibility and is granted deference in that regard as long as he explicitly discredits a claimant's subjective testimony and gives good reasons for doing so. *Id.* at 696. *See* 20 C.F.R. §§ 404.1529(c), 416.929(c) (listing factors to consider); *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984); Soc. Sec. Rul. 96-7p, 1996 WL 374186, at *3, *5 (S.S.A. 1996).

Here, the ALJ stated that he had evaluated Plaintiff's subjective allegations severe pain and symptoms utilizing the criteria of *Polaski* and the relevant regulations and rulings. (Tr. 16-17.) He expressly found that her allegations were "not borne out by the overall record and are found not to be fully credibile." (Tr. 19.) He gave several reasons for his credibility determination: (1) the lack of objective medical findings to support a disabling level of pain and other symptoms; (2) the fact that Plaintiff's physicians had limited her access to pain medication and she had declined steroid injections for her pain; (3) the fact that no physician had placed limitations on her to the extent alleged; and (4) the extent of her daily activities since her alleged onset date, including part-time work. (Tr. 17-18.)

These are valid reasons for discounting credibility, and they are supported by the record. *See Steed*, 524 F.3d at 875-76 (no error in discounting credibility where self-reported limitations were inconsistent with medical evidence of mild or minimal findings

related to back condition, as well as daily activities, including housework, caring for child, cooking and driving); *Pelkey v. Barnhart*, 433 F.3d 575, 578-79 (8th Cir. 2006) (decision to discount subjective complaints was supported by absence of any medical opinion that claimant was unable to work, and physician recommendation of exercise and medication, rather than surgery); *Goff*, 421 F.3d at 792-93 (proper to discount allegations of disabling pain due to lack of corroborating medical evidence, claimant's activity level, and her ability to engage in part-time work); *Ellis v. Barnhart*, 392 F.3d 988, 996 (8th Cir. 2005) (physician's concern that a claimant is becoming addicted to narcotic medication can provide a basis for disbelieving the severity of the claimant's complaints of pain); *Anderson v. Barnhart*, 344 F.3d 809, 815 (8th Cir. 2003) (claimant's misuse of medications is a valid factor in ALJ's credibility determination); *Baldwin v. Barnhart*, 349 F.3d 549, 557 (8th Cir. 2003) (none of claimant's physicians restricted or limited his activities).

Furthermore, the ALJ did not ignore Plaintiff's physical limitations and pain, acknowledging that she would have "some level of discomfort" and thus limiting her to light work with the accommodations identified above. (Tr. 17, 19.)

The record thus shows that the ALJ adequately considered Plaintiff's chronic pain, fibromyalgia and related limitations, and substantial evidence supports his assessment of what she remains physically capable of doing.

V.

After a careful review of the evidence and all arguments presented, the Court finds that Plaintiff's arguments for reversal are without merit and that the record as a whole contains substantial evidence upon which the ALJ could rely in reaching his decision.

ACCORDINGLY, the final decision of the Commissioner is **affirmed** and Plaintiff's case is **dismissed** with prejudice.

IT IS SO ORDERED this 28th day of September, 2009.

_____
UNITED STATES MAGISTRATE JUDGE